## Caroline Rubo v. John C. Bennett.

1. MORTGAGES—*When Absolute Deeds Are.*—Every deed conveying real estate, absolute in form, but appearing to have been intended as a security in the nature of a mortgage, is to be considered as a mortgage. (R. S. Ch. 95, Sec. 12.)

2. SAME—*When Deeds Will be Held to be Mortgages.*—Where it clearly appears from the evidence that the parties to a deed, absolute in form, have intended that it should operate as a mortgage only, to secure a debt, the courts should hold it to be in effect a mortgage.

3. DEEDS—*Construction of.*—A deed absolute in its terms should not be given a different effect, unless the evidence to warrant it, is clear and satisfactory.

4. SAME—*Inadequacy of Consideration.*—Inadequacy of price is not alone good for holding a deed to be a mortgage. But where no consideration whatever moves to the grantor, except money advanced to be expended upon the land, it is a fact tending very strongly to show that there was no sale.

5. QUESTION OF FACT—*Whether a Deed or Mortgage.*—The question as to whether an instrument is a deed or mortgage is one of fact, to be determined from the evidence in the case.

6. EVIDENCE—*Whether a Deed or a Mortgage.*—The facts that negotiations for a loan were pending when the deed was made, and that the grantee retained possession of the premises, and of inadequacy of consideration, are matters to be considered in determining the question as to whether an instrument is a deed or a mortgage.

7. EQUITY—*The Question in Cases of Doubt.*—In case of doubt existing from all the surrounding circumstances, a court of equity will lean to the holding that it is a mortgage rather than a sale.

**Bill to Have a Warranty Deed Declared a Mortgage.**—Appeal from the Circuit Court of Cook County; the Hon. JOHN C. GARVER, Judge, presiding. Heard in this court at the March term, 1899. Reversed and remanded. Opinion filed November 16, 1899.

**Statement.**—Appellant filed her bill in chancery against appellee, alleging, among other things, that on September 4, 1897, appellant was indebted to appellee in the sum of $500, and to secure the payment thereof executed an absolute deed of conveyance, of that date, to appellee, of the premises described in her bill; that said deed, although appearing to be absolute on its face, was not intended to be such by the parties thereto, but that it was understood and agreed between them that the premises were to be held by appellee simply as security for the payment of said sum and interest; and that upon the payment by appellant of that sum, and interest, to appellee, he would reconvey the premises to appellant.

Appellee filed his answer to said bill, in which he admits that complainant conveyed to him, in fee simple, by absolute warranty deed, the premises in question, but denies that appellant was indebted to him in said sum of $500; or any other sum; denies that said deed was given as security, or as a mortgage, and denies that said warranty deed was not intended to be such by appellant; and, on the contrary,

avers that said deed was intended and understood by appellant and appellee to be an absolute conveyance of said property to appellee. A replication was filed to this answer.

The question presented by the pleadings was whether or not the deed of conveyance from appellant to appellee was intended as an absolute conveyance, or merely a mortgage to secure a debt.

The evidence discloses that prior to September 4, 1897, appellant owned the premises in question, consisting of 100 feet of land and a small cottage; that the property was incumbered by a first mortgage for $2,500, and a second mortgage for $249.33, and that there were several special assessments due, amounting to about $250. The mortgage indebtedness was about to become due. Appellant was anxious to obtain a new and larger loan, to enable her to pay off all these various indebtednesses. To that end she applied through her agent, E. A. Birch, to the agents for the first mortgage. They refused to renew their loan of $2,500 for the increased amount, viz., $3,000, but were willing to renew it for $2,500. She then sought a loan of $500 upon a second mortgage, with which she might pay off the second mortgage of $249.23 and the $250 of assessments. Birch, her agent, took her to appellee, who had at some time sustained the relation of a business partner to Birch. As to what occurred between appellant and appellee, in the transactions following upon the application for a loan of $500, is a matter of conflict in the evidence. Birch has since died. Appellant tells one story and appellee another. Neither is corroborated, except by the facts and circumstances of and following the transaction.

A warranty deed, absolute in form, was made by appellant to appellee, conveying the land, subject to the $2,500 and the $249.23 mortgages, and also subject to all taxes of 1897 and thereafter. The expressed condition of the deed was $3,250. No money was paid by appellee to appellant, save $500, which was delivered to her agent, Birch, and expended largely upon the property conveyed. Appellee

testified that the money was expended as follows: $125 paid upon first mortgage; $260.48 paid upon taxes; $15 paid upon second loan; $99.52 paid as commissions on extension of loan. Of the money paid for taxes, all except $65.26 was paid for taxes upon the property in question. The first mortgage was extended. It was arranged to extend the second mortgage of $249.23 for one year. At the time of the execution of the warranty deed there were also executed the following other instruments:

"CHICAGO, ILLINOIS, Sept. 1, 1897.
J. C. BENNETT:
Please pay the proceeds of the sale of my lots ten and eleven, Hardin's addition to Evanston, Illinois, to Mr. E. A. Birch's order, and his order and receipt shall be of the same force and effect as my own, he being my agent in this matter.                                      CAROLINE RUBO."

"This memorandum witnesseth, that Caroline Rubo, a widow, hereby agrees to purchase at the price of thirty-seven hundred and fifty (3,750) dollars, the following described real estate, situated in the county of Cook and State of Illinois: All of lots ten (10) and eleven (11), block two (2), in Harding's addition to Evanston, in Cook county, Illinois, section 19, township 41 north, range 14, east of the third principal meridian, and J. C. Bennett agrees to sell said premises at said price, and to convey or have conveyed to said purchaser a good and merchantable title thereto, by general warranty deed, as he shall then have, but subject to (1) existing leases, and all leases then thereon, the purchaser to be entitled to the rents from final payment hereon; (2) all taxes and assessments levied after the year 1890; (3) any unpaid special taxes or assessments; it being the intention of the parties hereto to give Caroline Rubo an option of purchase, she having sold and conveyed the above property absolutely to J. C. Bennett, and hereby acknowledges payment in full therefor.

"Said purchaser has paid nothing (000,000) dollars as earnest money, to be applied on such purchase when consummated, and agrees to pay .............., or accepted by him, the sum of one thousand ($1,000) dollars at the office of J. C. Bennett, Chicago, Ill., on or before one year from date, provided a good and sufficient general warranty deed conveying to said purchaser a good and merchantable title to said premises (subject as aforesaid) shall then be ready

for delivery. The balance to be paid as follows: By assuming two trust deeds now an incumbrance on said lots, amounting to $2,749.27, together with the interest thereon from date, as per these terms, and if paid by J. C. Bennett, or for him, then whatever is paid shall be added to the $1,000 with seven per cent interest thereon, with interest from the date thereof at the rate of seven per cent per annum.

"Should said purchaser fail to perform this contract promptly on her part, at the time and in the manner herein specified, the earnest money paid as above shall, at the option of the vendor, be forfeited as liquidated damages, and this contract shall thereupon become null and void. This is of the essence of this contract, and of all the conditions hereof.

"The notices required to be given by the terms of this agreement shall in all cases be construed to mean notices in writing, signed by or on behalf of the party giving the same, and the same may be served either upon the other party or his agent.

"This contract shall be held by E. A. Birch in escrow for the mutual benefit of the parties concerned, and after the consummation of the sale he shall be at liberty to retain the canceled contract. And it shall be the duty of said E. A. Birch in case said money is not paid as herein provided, to deliver this contract to the vendor or his agent on demand.

"Witness the hands of the parties hereto this 4th day of September, A. D. 1897.

> "Caroline Rubo.
> "John C. Bennett."

There was also then executed a lease made by appellee as lessor, to appellant and her son as lessees, purporting to demise the premises in question for eight months from September 1, 1897, at a monthly rental of three dollars, payable in advance at office of E. A. Birch & Co.

All the arrangements for the extension of the two mortgages were made by the appellant, partly before and partly after the agreement between appellant and appellee was entered into. Appellee testified:

"At the date this warranty deed attached to the bill of complaint was executed, I told Mrs. Rubo if it was executed and the contract, and they got the extension of those loans, that I would buy the property with $2,749.27,

about $2,750, against it—that was the amount of the mortgages—and pay her $500 for it, and give her an option to purchase it within one year for $1,000. She said she thought she could sell it for $4,500 or $5,000. I didn't think she could. She said they had arranged with the loan people for the first loan. The second loan, I believe, at that time had not been arranged for, and thought they could get Mr. Haskamp. I believe he was a friend of Mrs. Rubo, or an acquaintance of her husband, living at Evanston. Mr. Birch said he would talk to him and get that extended. Those papers were executed with the understanding that that should be done, and it was afterward done."

After the executing of the deed and other papers the following transactions and circumstances occurred relating to the matter in question: Appellant obtained extension of the second mortgage of $249.23. Appellant remained, and ever since has been, in possession of the premises. No rent has been paid by her and no rent demanded by appellee. After the making of the deed on September 4, 1897, appellant executed extension notes for the first mortgage loan, and paid two of such notes, amounting to $75 each, in the year 1898. On August 22, 1898, she paid the taxes of 1898 upon the property, amounting to $63.08. She also made repairs and paid for insurance upon the cottage.

Evidence as to value of the premises is conflicting. The estimates of experts called as witnesses vary from $35 to $60 per front foot. The agent of the first mortgagee estimated the value in making the loan at $5,000 for the land and $700 for the cottage. Appellee also paid some interest on the mortgage loans after September 4, 1897, the date of the warranty deed, the amount so paid by him being $87.50. He testified that he had not paid the other interest after receiving the deed because "it was paid each time when I got there," and that he believed that Mrs. Rubo (appellant) had paid it. In September or October, 1898, appellee bought the second mortgage notes, amounting then to $240 and some interest, and he testified that he now holds them for his wife's mother, with whose money he claims to have bought the notes.

The evidence as to the conversation between the parties, at the time of the execution of the deed and other papers, is limited to the testimony of appellant and appellee. Appellant testified :

" Afterward I met him when I was trying to get a loan. I went to Mr. Birch and he told Mr. Bennett to let me have it—$500. I went back and forward with Mr. Birch to Mr. Bennett's office, and at last he said : ' I think I can let you have ——.' He came again to my place. He said, I think he will let you have $1,000; he said I should go to Mr. Bennett's office to receive it. My taxes were due and a mortgage was near due. I took my tax book along; I thought when I received the money I would pay my taxes right away. So Mr. Birch, when I got there—I don't know exactly the date—the first time I was there, I guess, was the 4th of September, 1897.

" Mr. Birch wasn't there. As I came in Mr. Bennett asked me if I knew what I was there for. I said Mr. Birch told me he intended to let me have $1,000. He says, 'Well, if you don't understand it, I want nothing to do with you.' He knew my taxes were due and everything else, and that I was looking for money. He said I ought to have somebody there to attend to it. I says, I thought I had Mr. Birch there to attend to it; to get the money for me. Finally he told me how he would do; he would lend me $500 for one year, and instead of $500, I should pay him $1,000 back. * * * I signed the papers that he had drawn up for the money."

And further, upon cross-examination :

" In place of $500 I wanted $1,000; he wanted $500. He said he would lend me $500 and in place I should give him $500; he wanted $1,000 back in one year. I was saying that was too much. He said it wasn't too much, because he would be responsible for what came in; that I wouldn't pay the taxes there or anything; he would pay that."

" What did you say then? A. I thought it wasn't so very much, if he would pay that up for me. I thought it wouldn't come so very high, but there was nothing paid, that was all he said; he said he wouldn't do more than that, and that Mr. Birch should get those papers to rent the place, and the money should go for the interest, and he should save the money for me—Mr. Birch should. Mr. Bennett told him so at the same time. I guess that is all that was said there.

"Q.  Why did you think it was necessary for you to make this arrangement with Mr. Bennett at this time?  A. I wanted to pay my taxes, and this interest renewed—this mortgage renewed.

"I have heard the testimony of Mr. Bennett.  Mr. Bennett, in conversation with me at the time the deed was signed, did not ever say to me that he was going to buy the property.  The word 'buy' was not used in that conversation."

Appellee testified :

"When she first came to my office in 1897, relating to the transaction in question in this suit, she said in reference to the deal, 'You know my property on Maple avenue is encumbered and the encumbrance is nearly due, and my taxes are nearly due,  *  *  *  and I have got to do something about the property or the mortgage will be foreclosed.'  Previous to that time I had learned that this property was encumbered; I knew it at that time.  She said she had attempted to make loans,  *  *  *  and that they wouldn't make her a new loan, and she wanted me to help her out on her encumbrance.  She would like to make a loan of money, a third loan of money, until such time as she could sell the property.  I told her the property was encumbered nearly all it was worth, being then encumbered for something like $3,100, and that I wouldn't consider a loan under any circumstances.  The loan was previously spoken of, and I had answered it in one word that I wouldn't contemplate the subject for a minute—for a third loan, all of them due and the taxes due, and a tax sale about to start.

"Those things were all talked over.  We talked of how much the encumbrance was in a general way; we couldn't get at the exact figures; we couldn't get at the taxes and assessments, and I didn't know how much the interest on the first mortgage was; I think it was stated to be $87.50, which it afterwards proved to be.  There had to be an extension of the loan and the commissions would carry the encumbrance up to what I considered the value of the property.  She said she was going to lose it, because if the mortgage was foreclosed she could not afford to redeem it; she hadn't the money.  Mr. Birch, who was with her, told me he had been her agent for several years.  I said I thought the property was encumbered for nearly all it was worth, and I didn't want to bother with it.  She asked me if I could possibly do something to help her out until she could

Rubo v. Bennett.

get a chance to sell it. She said it would be a great favor. I think the woman almost wept.  *  *  *

"Q. After this conversation did you say to Mrs. Rubo that you would put a second mortgage on the property?

"A. I did not.  *  *  *  I often stepped into Mr. Birch's office, and she was frequently there. I saw her several times. I don't know whether between these dates or not. I don't really remember the exact date this deal was made and the papers drawn up, but I think the 4th of September, 1897. I don't remember the exact date. The date is on that deed.

"Q. State what took place at any other conversation relating to this transaction on the 4th of September, 1897, when the deed attached to the bill of complaint was executed by Mrs. Rubo? A. I was sitting at my desk when Mrs. Rubo came in. She said, 'Is Mr. Birch here?' I said, 'No.' She said, 'He made an appointment to meet me here this morning.' She said she was anxious to see him. She waited, I guess, twenty minutes or fifteen minutes, and she said she was anxious to go and would like to sign the papers and go, and not wait for Mr. Birch, because he might not come. I had in the meantime told Mr. Birch that I would purchase it for $500. Mr. Birch had evidently told her and she came in. I had drawn up the deed and contract in evidence here and she said she wanted to sign it. I had the stenographer come in and read the contract to her. This document now shown is the contract, to the best of my knowledge and belief. I saw Mrs. Rubo sign it in September, 1897. It was read to her before she signed it. At the date this warranty deed attached to the bill of complaint was executed, I told Mrs. Rubo if the deed was executed and the contract, and they got the extension of those loans, that I would buy it with the $2,749.27, about $2,750, against it—that was the amount of the mortgages—and pay her $500 for it, and give her an option to purchase it within one year for $1,000. She said' see thought she could sell it for $4,500 or $5,000. I didn't think she could. She said they had arranged with the loan people for the first loan; the second loan I believe at that time had not been arranged for.  *  *  *  I told her I cared nothing about the property in the matter of rents as long as she intended to take advantage of the option. She said she would like to have her son live in it. I said, 'You and Mr. Birch take care of the property and get all you can out of it, and pay it on the taxes; I have nothing to do

with it until you have either bought it or get out of it under that agreement.' I don't know what she said about it."

The trial court, after hearing in open court, upon bill, answer and replication, entered a decree dismissing the bill for want of equity.

DENNIS & RIGBY, attorneys for appellant.

The line between mortgages and conditional sales is very narrow; the decision of the question usually depends not alone or even chiefly on the form of the document or the express declaration of the parties, but rather on the circumstances surrounding the entire transaction; in other words, it is a question of intention, and the intention of the parties must be gathered rather from their acts and circumstances than from express declarations. Miller v. Thomas, 14 Ill. 428, 430; Bearss v. Ford, 108 Ill. 16, 23; Workman v. Greening, 115 Ill. 477, 479, 480; Peugh v. Davis, 96 U. S. 332, 336, 338, 24 L. Ed. 775; Montgomery v. Spect, 55 Cal. 352; Jasper v. Hazen, 4 No. Dak. 1; 23 L. R. A. 58.

The question being really whether a debt was created or not, and being one of intention, as stated above, the following *indicia* of intention have been held important as pointing to the existence of debt, and thus that the transaction was in the nature of a mortgage.

First. That interest or an increased consideration was to be paid to the grantee for the use of his money. 15 Am. & Eng. Ency. Law, 781.

Second. That there had been, when the deed was executed, negotiations pending for a loan. Horn v. Keteltas, 46 N. Y. 605; Fiedler v. Darrin, 50 N. Y. 438, 442; Davis v. Demming, 12 W. Va. 246, 283.

Third. That the parties by their acts did not treat it as a sale, but the grantor remained in possession as owner. Clark v. Finlon, 90 Ill. 245, 246, 247.

Fourth. The character of the transaction must be determined by what it was at its inception. " Once a mortgage always a mortgage." 15 Am. & Eng. Ency. Law, 782.

Fifth. Inadequacy of consideration is a valuable, though

not conclusive evidence of mortgage.    Perce v. Robertson, 13 Cal. 116; Morris v. Nixon, 42 U. S. 118; 11 L. Ed. 69.

Sixth.    Mrs. Rubo's own valuation is important upon the question of intention, as proving that she never would have consented to a sale upon the terms of the one claimed by Bennett to have been made.    Jasper v. Hazen, 4 No. Dak. 1; 23 L. R. A. 58, 65.

Seventh.    The acts of the parties after the execution of the deed are important as showing their understanding of the transaction immediately after its conclusion.    Jasper v. Hazen, *supra*, 4 No. Dak. 1; 23 L. R. A. 58, 65.

Each case must be judged by its own circumstances; but if the circumstances surrounding the transaction leave the intention doubtful, the leaning of the court will be toward construing the agreement to be a mortgage.    15 Am. & Eng. Ency. Law, 783.

J. C. BENNETT, *pro se.*

The deed on its face is absolute, and the burden is on complainant to prove by clear and satisfactory evidence that it was in fact a mortgage.    Strong v. Strong, 126 Ill. 301, 308; Story v. Springer, 155 Ill. 25–31; Jones on Mortgages, Vol. 1 (4th Ed.), Sec. 293.

Land can not be conveyed as security for a debt where no debt exists.    Rue v. Dole, 107 Ill. 275.

One who alleges that his deed in absolute form was intended as a mortgage only, is required to make strict proof of the fact.    Having deliberately given the transaction the form of a bargain and sale, slight and indefinite evidence should not be permitted to change its character. The proof must be clear, unequivocal and convincing.    The fact that the grantor understood the transaction to be a mortgage is not alone sufficient.    Jones on Mortgages, Vol. 1, 4th Ed., Sec. 335.    See, also, Bentley v. O'Bryan, 111 Ill. 62, and cases there cited.

Even if it appeared that the grantor remained in possession, in continuance of his former occupancy, it would not be sufficient to show a deed to be a mortgage.    Pitts v. Cable, 44 Ill. 103–107.

In a contract partly printed and partly written the written part is to be given greater weight than the printed. Am. Eng. Ency. of Law, 1st Edit., Vol. 3, p. 868, note; Bolman v. Lohman, 79 Ala. 63; Michaelis v. Wolf et al., 136 Ill. 68, 72.

MR. PRESIDING JUSTICE SEARS delivered the opinion of the court.

But one question is presented upon this appeal, viz.: whether, upon all the evidence, the deed in question, though absolute in its form, should be held to be in fact a mortgage. The statute, section 12, chapter 95, Revised Statutes, provides that "every deed conveying real estate, which shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage."

The decisions of our Supreme Court are uniform in holding that where it clearly appears from the evidence that the parties to a deed absolute in form have intended that it should operate as a mortgage only, to secure a debt, then the courts should hold it to be in effect a mortgage. Miller v. Thomas, 14 Ill. 428; Smith v. Cremer, 71 Ill. 185; Heald v. Wright, 75 Ill. 17; Clark v. Finlon, 90 Ill. 245; Bearss v. Ford, 108 Ill. 16.

And there is a long line of decisions, from Pitts v. Cobb, 44 Ill. 103, to Story v. Springer, 155 Ill. 25, in which, while it has been held that under the peculiar facts presented in the respective cases the deed should be held to be absolute in its effect according to its terms, yet the well established rule is not departed from, but asserted—that if it appear clearly and from satisfactory evidence that the intention of the parties was that the deed should have the effect of a mortgage only, that intention will be carried out by the courts.

It is also held that a deed absolute in its terms should not be given a different effect unless the evidence is clear and satisfactory to warrant it.

The rule of law governing is well settled. The question

presented and determinative of the case is one of fact only. The weight accorded to the findings of fact by the trial judge, who has seen and heard the witnesses, is also to be considered in passing upon the question here presented. With due consideration for this, we have examined the evidence in the case with great care, and from it all we are compelled to reach a conclusion different from that of the learned chancellor who entered the decree.   It is true that there are but two witnesses to the controlling facts; but one of them has testified to a state of facts inherently improbable, and the other is corroborated by all the surrounding and subsequent circumstances of the transaction.

If the account of the transaction given by appellee is true, then this woman has deeded to him her property, worth at the least estimate of the witnesses, $4,200, and at the highest estimate $6,700, subject to $2,750 of indebtedness, for the sole consideration of $500, which sum of $500 and nearly a hundred dollars additional, the vendor at once proceeded, under agreement with appellee, the purchaser, to expend upon the property which she had sold.

Mere inadequacy of price is not alone good ground for holding this deed to be a mortgage.   Story v. Springer, 155 Ill. 25.   But where no consideration whatever moves to the grantor, except money advanced to be expended upon the land, it is a fact tending very strongly to show that there was no sale.

Aside from the matter of adequacy of consideration for the deed, all the circumstances surrounding the transaction and the conduct of the parties subsequent thereto, lead to the conclusion that the parties intended the deed as security for the repayment of the $500 expended upon the land by appellee, together with an additional $500 for forbearance money.   The undisputed evidence shows that at the time of the negotiations appellant was seeking a loan, not a purchaser; that she valued the land at much more than the sum made up by the $500 and the encumbrances, and, according to appellee's own statement, still expected to realize such sum by a sale in the future; that appellee said to her that

he cared nothing about the property in the matter of rents as long as she intended to take advantage of the option; and that he had nothing to do with the property until she should either "have bought it or got out of it under that agreement;" that appellant obtained the extension of mortgages after the alleged sale and executed interest notes thereon; that she paid certain of these notes, and that she paid for insurance and taxes. We are inclined to think that appellee, while exercising his skill as a lawyer to give the transaction all the *indicia* of an absolute sale, yet did not himself regard it as constituting anything but security. In his examination as a witness, the following occurred:

"Q. You wanted $500 for the use of your $500 for a year, is that the idea? A. No, assuming the risk."

All of these admitted facts are wholly inconsistent with the theory that appellant had parted with, and appellee had acquired, both the legal and equitable ownership of the land. It is clear that, according to the ostensible transaction, the mortgages were assumed by appellee as part of the purchase money. The amount of the mortgages and the $500 together make $3,200, the expressed consideration of the deed. If the transactions were in reality a sale, appellee and not appellant thereafter bore the obligation to pay these mortgages and the interest notes for interest thereon. Such would be the obligation arising, as a matter of law, from the mortgage indebtedness being treated as a part of the consideration. And as a matter of fact, appellee testifies that he did assume these mortgages. In answer to the question, "What is the amount you assumed?" he testified "$2,745.27." And yet appellant proceeds thereafter, with the apparent acquiescence of appellee, to care for the extension and payment of interest upon this indebtedness assumed by appellee.

The testimony of appellee, that an absolute sale was intended, is, as we view it in the light of all the surrounding circumstances, incredible.

If the testimony of appellant be taken as true, as we think it should be in view of all the facts and circumstances

proved, then appellee could have enforced the payment of his loan of $500 (without the usurious interest contended for) in an action at law.

While, perhaps, no one of these facts, inconsistent with the theory of an absolute sale, would be sufficient of itself to constitute the clear and satisfactory showing which the law requires, yet each is entitled to consideration, and together they present a strong case.

The fact that negotiations for a loan were pending when the deed was made, is to be considered. Fiedler v. Darrin, 50 N. Y. 437; Morris v. Nixon, 1 How. 118; Davis v. Demming, 12 W. Va. 246.

The fact that the grantee retained possession of the premises is to be considered. Clark v. Finlon, *supra*.

We do not regard the existence of a lease, which neither party ever treated as operative, as affecting the fact of possession by appellant.

The circumstances of appellee leaving appellant to bear the burden of loan extensions, interest payments and insurance, are all entitled to consideration. Miller v. Thomas, *supra*, wherein the court said: "In cases of this sort the real character of the arrangement may as often be gathered from the nature of the transaction and character of the circumstances as from the express declaration of the parties."

Inadequacy of consideration, though not alone controlling, is to be considered. Story v. Springer, *supra*.

And in case of doubt existing from all the surrounding circumstances, a court of equity will lean to the holding that it is a mortgage rather than a sale. Conway v. Alexander, 7 Cranch, 218.

In that case it was held that the facts established an absolute sale; but the court held, as a rule applicable to the determination, that "the want of a covenant to repay the money is not complete evidence that a conditional sale was intended," and "doubtful cases have generally been decided to be mortgages."

The decision in Clark v. Finlon, *supra*, is very much in

point, and also the decision in Jasper v. Hazen, 23 L. R. A. 58.

While each case of this class, where it is attempted to be established that a deed absolute in form is in reality only a mortgage, must of necessity be determined by the facts of the individual case, measured by the rule of law that the evidence must be clear and satisfactory to warrant a court in holding the facts established, yet the cases above cited are enough alike in the facts presented, to be especially applicable to the case here considered.

We hold, therefore, that the findings and decree of the trial court are manifestly against the weight of the evidence.

The decree is reversed and the cause remanded.