THOMAS MORRIS, COMPLAINANT AND APPELLANT, v. MARIA NIXON, HENRY J. WILLIAMS AND THOMAS BIDDLE, HENRY J. WILLIAMS AND MARIA NIXON, EXECUTORS OF THE LAST WILL AND TESTAMENT OF HENRY NIXON, DECEASED, AND MARIA NIXON, SOLE DEVISEE OF THE SAID LAST WILL AND TESTAMENT OF HENRY NIXON, AND MARY HUSBAND, AMELIA M. MORRIS, ROBERT MORRIS, WILLIAM P. MORRIS, CHARLOTTE E. MORRIS, HENRY MORRIS, SARAH MORRIS, CHILDREN AND HEIRS AT LAW OF HENRY MORRIS, DECEASED, AND CORNELIUS STEVENSON AND SAMUEL C. CLEMENTS, ADMINISTRATORS OF SAID HENRY MORRIS, DECEASED.

A deed, absolute on the face of it, declared to be a security for money loaned.

Where a bill substantially charges that there is a fraudulent attempt to hold property under a deed, absolute on the face of it, but intended as a security for money loaned, evidence will be admitted to ascertain the truth of the transaction.

Where there is proof of parties meeting upon the footing of borrowing and

Morris *v.* Exec. of Nixon et al.

lending, with an offer to secure the lender by a mortgage upon particular property, if a deed of the property, absolute on the face of it, be given to the lender, and the lender also take a bond from the borrower, equity will interpret the deed to be a security for money loaned, unless the lender shall show, by proofs, that the borrower and himself subsequently bargained upon another footing than a loan.

Where a loan is an inducement for the execution of a deed which is absolute on the face of it, though the loan is not recited as the consideration of the deed, or as any part of it, if the lender or grantee in the deed treats it substantially as the consideration, or a part of it, equity will declare the deed to be a security for money loaned.

The answer of one defendant in equity is not evidence in behalf of another defendant.

If, in equity, it is admitted or proved that one of the documents in a transaction was not intended to be what it purports, it subjects other documents in the same transaction to suspicion.

THIS was an appeal from the equity side of the Circuit Court of the United States in and for the eastern district of Pennsylvania, and arose upon the following facts.

On the 2d of January, 1812, Jonathan Williams and Thomas Morris (the complainant) purchased from the Bank of North America a parcel of land upon the Schuylkill river, near the city of Philadelphia, for the sum of $80,000; $20,000 of which was to be cash, and the remaining $60,000 was divided into three payments of $20,000 each, which were to become due on the 25th of March, 1814, 1815, and 1816, respectively. The parties gave their joint and several bonds for these sums, with a warrant of attorney to confess judgment, and a mortgage upon the property. It afterwards appeared that Morris was not exclusively the wner of his moiety.

On the 27th June, 1812, Morris gave a power of attorney to Thomas Biddle and Henry Nixon, to manage the property for him.

In 1815, Williams died intestate, leaving Henry J. Williams and Christine, the wife of Thomas Biddle, his heirs at law.

In April, 1816, Morris and the representatives of Williams executed a power of attorney to Biddle and Nixon, authorizing them to enter into and take possession of the property, sell or lease it, receive the money, execute deeds, &c.

Under this power, they accordingly took possession, and exercised all manner of ownership over it.

A great number of letters between the parties were given in

evidence, running from this time to the year 1822, relating to the condition and prospects of the property. One of the bonds had been paid out of the proceeds of sales, and considerable payments made on account of another. The third was wholly unsatisfied.

In 1822, Morris, residing in New York, applied to Nixon for a loan, under the circumstances stated so particularly in the opinion of the court that it is unnecessary to mention them here. Nixon declined making a loan, but took from Morris a deed, absolute upon the face of it, conveying the whole of Morris's interest to Nixon, and reciting that Nixon had always been interested in the purchase to the extent of three-sixteenths of the whole, or three-eighths of Morris's moiety. Nixon then loaned to Morris $5000, for which he took his bond.

The deed also recited that there had been allowed to Nixon for his agency, the sum of $2000; one-half of which, or $1000, had been paid by the representatives of Williams, but paid to Morris; and five-eighths of the other $1000, (or $625,) were justly chargeable to Morris; thus bringing Morris in debt to him $1625, which was released in the deed. It also contained other recitals, which are mentioned in the opinion of the court.

In 1836, Morris filed a bill on the equity side of the Circuit Court of the United States for the eastern district of Pennsylvania, against Nixon and other parties, alleging that the deed was only a security for the money loaned; that, at the time of its execution, there was not, between himself and Nixon, any contract, agreement, understanding, or negotiation for a sale; that Nixon had furnished no account of his agency; and praying for an account and general relief. The parties all answered; and in April, 1841, the Circuit Court, after a hearing, dismissed the bill with costs. The complainant appealed to this court.

*Wood*, for the appellant.

*Sergeant* and *Williams*, for the appellees.

*Wood* made the following points:

I. The deed of the 28th May, 1822, explained by the letter of the defendant, Nixon, to the plaintiff, would constitute *per se* a mortgage of the premises to secure the loan for $5000.

II. The said deed was designed by the parties thereto to secure the said loan, and was designed in substance to be a mortgage,

assuming the shape of an absolute conveyance, only as a more effectual security for the loan.

III. If said Nixon designed otherwise, yet the complainant was led by his conduct, and by all the circumstances, to consider it a security for the loan, and it ought to be treated as such.

IV. A deed, though absolute on its face, may be shown, by parol evidence, to be designed as a security for a loan, or a mortgage, and more especially by written evidence furnished about the time the deed was given, and conducing to show the same.

V. If it should appear that said deed was designed by the parties to be an absolute conveyance in fee, it ought to be set aside, or modified and converted into a mere security for said loan. Because:

1. The consideration therein was grossly inadequate.

2. There was no negotiation for a sale between the parties thereto, either personally or through authorized agents, and no estimate of value.

3. The plaintiff, the grantor therein, was not in a condition to deal at arm's length—being much embarrassed, in want of money, and ignorant of the condition of the property—the grantee being a capitalist, having the property under his management, and fully acquainted with its condition and value.

4. The grantee did not fulfil his duty as steward and agent in apprizing the grantor, at the time of said conveyance, of the condition and value of said property.

5. Undue influence was exercised by the grantee upon the grantor, in pressing upon him a sale to himself in the condition in which said grantor was placed, and in the relative condition in which they stood at the time to the property and to each other, as lender and borrower, steward and principal.

VI. Lapse of time is no bar to the complainant's equity under the last-mentioned point. Because:

1. Such a bar is not set up and relied upon in pleading.

2. The influence and control of the said grantee in said deed, over the grantor, and the grantor's ignorance of the condition of the property, continued until a short time before exhibiting the bill of complaint.

3. The relationship in which the parties stood to each other,

as steward and principal, lender and borrower, will prevent the bar from applying in equity to the relief sought for by the bill.

VII. Lapse of time is not a bar to the complainant's equity, for a full account and relief in regard to the matters arising, as well before as subsequently to the said deed. All which he is fully entitled to.

VIII. The agreement, for a conveyance from the complainant to Maria Nixon, should be modified so as to embrace only one-eighth of the plaintiff's moiety of the premises, and she should be decreed to be entitled only to the net proceeds of said one-eighth part.

Mr. Justice WAYNE delivered the opinion of the court.

The complainant, besides other relief prayed for, asks the aid of this court to decree a deed made by him to Henry Nixon, and which is absolute on the face of it, to be a security for money advanced upon loan, and that he may be at liberty to redeem the premises conveyed, by paying to Nixon, or by allowing to him, on account of the transactions between them, the moneys loaned to him by Nixon and such as he may have advanced on account of the real estate purchased by the complainant and the late General Jonathan Williams from the Bank of North America; for the resale and improvement of which, the defendants, Henry Nixon and Thomas Biddle, were the attorneys and agents of the purchasers.

The surviving family, however, of General Williams, are in no way interested in this suit. The controversy is between Thomas Morris and the representatives of Henry Nixon, whose death has occurred since the bill was filed.

The deed from complainant to Henry Nixon bears date the 28th May, 1822.

It recites the purchase made by Williams and Morris; that certain portions of it had been sold and conveyed to other persons, and that parts had been let on ground-rents, so that the quantity remaining was about seventy acres. That the sales and income of the property had nearly reimbursed the purchasers the first payment which they had made, of $20,000; that there had been paid upon the purchase, out of the income and proceeds of sale, from time to time, enough to reduce the sum due by the

purchasers, to about $29,000, which was a charge upon the premises, to be borne by the owners thereof, in proportion to their respective interests. It then recites, that at the time of the execution of the indenture to Williams and Morris, Henry Nixon was, and had continued to be interested with Morris, to the extent of three-eighth parts of the moiety, so as to entitle him to the benefits and subject him to the obligations of the purchase in that proportion. The consideration of the deed is then recited to be, one-half part, "or thereabouts," of a debt due by the complainant to Thomas Biddle and John Wharton, which was originally $4000, for the security of which, the complainant had, with the assent of Henry Nixon, mortgaged a part of the moiety of the original purchase; then a debt claimed by Nixon to be due to him by the complainant of $1625; $1000 of which it is said the complainant received on account of Nixon's agency for the moiety of the purchase belonging to Williams, and $625 being the proportion justly chargeable to complainant for Nixon's agency for the other moiety. There was a further consideration amounting to $4600; being the amount of two notes which had been discounted, at the Bank of North America, for the accommodation of the complainant, with Nixon's endorsement.

The circumstances attending the execution of the deed are disclosed in the pleadings and by other proofs in the cause.

The complainant resided in New York, and Nixon lived in Philadelphia. The former, being in great pecuniary distress, and fearing greater within a few days, unless he could make a loan, sent his brother, Henry Morris, to Philadelphia, to obtain from their brother-in-law, Henry Nixon, an advance of $5000, offering, as security, his interest in the property bought by himself and General Williams. Nixon says, in his answer, that his feelings being wrought upon by the representation, made by Henry Morris, of the urgent nature of his brother's wants, and the destructive consequences to be apprehended if he could not meet a demand there was upon him, he concluded to provide the money; that, however, before he finally agreed to do so, he told Henry Morris that he must consult his counsel upon the subject.

After consulting counsel, he informed Henry Morris, that he had determined to deal with the complainant upon no other terms than an absolute sale and conveyance of all his interest,

legal and equitable, in the premises bought by him and Williams; and as there would be a full consideration without it, that the loan would create a new debt, for which he would take a separate evidence or security; that he was advised by his counsel to write out in the deed at large the real consideration, so that the truth of the transaction might at all times appear upon the papers, and to take a bond for the loan, so that if the purchase should turn out well, he would not be bound to enforce the bond, but, in case of misfortune to the complainant, ne would have evidence of his right as a creditor, and, if he should think fit, might use it for the benefit of the complainant or his family. In connexion, however, with the foregoing statement, Nixon declares that in the course of his conversation with his counsel, he was asked, whether the interest of the complainant in the property was worth the encumbrances upon it, and what was already due by him to Nixon. To which he replied, as he truly believed, that it would not bring more; that nothing but the peculiarity of the circumstances would induce him to increase his interest, or become a purchaser of it; and that he determined, as he had been advised by his counsel, to buy out the complainant's interest entirely and absolutely, without any trust, direct or indirect, express or implied; nor any understanding whatever, that the complainant or any other person was to have a claim or benefit therefrom, and that he would deal with him on no other terms.

Henry Morris arrived in Philadelphia on the 23d of May. His first conversation with Nixon concerning his errand was on that day; on the 24th, Nixon consulted counsel, informed Henry Morris of the result, and on the same day, the same counsel made a draft of the deed. On the same day, too, Nixon wrote to the complainant the following letter:

DEAR MORRIS,—Henry arrived here early yesterday morning. Having had a conversation with him on the subject of a loan, I have only to say my best exertions will be to obtain this object, and to enable me to do which, Henry will immediately call on you to advise the only mode that he or I can suggest to achieve it.

You, I am sure, will have confidence in me as to the mode proposed, which Henry will communicate; and be assured my sincere prayers will be, and best exertions to promote this all-important point.    In haste, truly yours,    H. NIXON.

This letter was written after Nixon had consulted counsel; for he says in his answer, after he had done so, he thereupon returned to Henry Morris, and informed him of the determination he had come to, of dealing upon no other terms than an absolute conveyance, without any trust, and taking a bond for the loan. And in the letter it is stated, that "Henry will immediately call on you to advise you of the only mode that he or I can suggest to achieve it."

The draft of the deed being made on the 24th May, it was afterwards engrossed by the witness Cash, and he was sent with it to New York. He arrived there on the 28th, the deed was signed by Morris and his wife, Cash and Henry Morris being witnesses. On the same day, Cash left New York on his return to Philadelphia. On the following morning, the 29th May, as it appears by a letter of that date from Nixon to the complainant, Henry Morris arrived again in Philadelphia. He says in his answer, that he found Nixon resolved to do nothing in the business unless the conveyance was absolute and *bona fide*, and he was therefore obliged to deliver the deed without any promises of trust. And Nixon declares that Henry Morris delivered to him the deed, and at the same time a bond, in the handwriting of the complainant, for $5000.

It is in proof, also, that when the deed was delivered, there were unadjusted accounts growing out of Nixon's and Biddle's agency for the property. That no account had been furnished to the complainant since 1816, except an abstract of one Innes's account of the excavation and sales of stone and gravel, sent to him by the defendant, Henry J. Williams, in May, 1819.

The recital in the deed shows that the accounts were unascertained, for it speaks of the $20,000 which was first paid by Williams and Morris on their purchase as being nearly reimbursed, and that there remained due on the purchase about $29,000.

Two years before the deed was executed, the complainant made an agreement with David Walker and Henry Morris, to convey to them in trust for his sister, Maria Nixon, a fourth part of her moiety, upon the terms stated in the agreement; in pursuance of his original intention when Williams and himself made the purchase.

L 2

It was urged in the argument, that the recitals in the deed relating to the sum then due upon the purchase of Morris and Williams, that of Nixon's interest in it, and the debt claimed by Nixon to be due to him on account of his agency, were incorrect. We shall not, however, consider these objections, or those which were made against the validity of the deed on account of inadequacy of price, undue influence, and surprise.

Our object is to dispose of this case for the present, by assigning to the deed its true character in equity, under all the circumstances attending its execution.

The charge against Nixon is, substantially, a fraudulent attempt to convert that into an absolute sale which was originally meant, by himself and the complainant, to be a security for a loan. It is in this view of the case that the evidence is admitted to ascertain the truth of the transaction, though the deed be absolute on its face. The transaction was begun by Morris, with the request of a loan from Nixon, for which he offered a security upon the property, for the management of which, Nixon was his agent. It ended by Morris giving to Nixon a deed for the property, absolute on its face, and also a bond for a loan of $5000. Unless, then, some proof has been given to show that they truly bargained upon another footing, and that the loan did not form the chief inducement for the execution of the deed, and had not been treated by both parties as a substantial part of the consideration, though not expressed in the recital, equity will interpret it to be a security for money loaned.

Is there any such proof in this case? None that we can see, even if the defendants are allowed to use as evidence, as they contend they have a right to do, the answer of their co-defendant, Henry Morris. His account of the transaction is, that in an interview with Nixon succeeding that when he made the application for a loan, and when Nixon declined lending, stating that his own embarrassments required all the funds he could command; that Nixon said, it was very doubtful if the "Hills property" would more than pay the claims upon it, and he could not consent to make the loan, unless Morris would convey the property to him; and he added, if the property should eventually turn out well, he would account to Thomas Morris for it, and share it with him. And in the third interview Nixon told him that his counsel had

advised him upon no account to let the complainant have the money, unless an absolute and *bona fide* conveyance of the whole premises was made; that, upon receiving his answer, he returned to New York, and communicated the determination of Nixon to his brother; and that, upon his return to Philadelphia, he was obliged to deliver the deed without any promises of trust, as he found Nixon resolved to do nothing in the business, unless the conveyance was absolute and *bona fide.* He says, however, he was satisfied in his own mind that, if the property turned out well, Nixon would give a handsome share of it to the complainant; and that, in consequence of this impression, he always wrote to him as if he was still interested in the successful result of the purchase. We are in no way, though, influenced by the answer of Henry Morris in coming to our conclusion as to the character of the deed. It has been introduced because it was strongly urged to be good evidence in behalf of the defendants, by their counsel; and with the view of showing, even though the facts stated had been proved, that they would not take the case out of the principle,—that a deed absolute on the face of it, for property, offered to secure a loan in a case in which the parties originally met upon the footing of borrowing and lending, will be considered a deed in the nature of a mortgage, to secure a loan, though another consideration shall be in the recital of the deed than the loan, unless it shall be proved that the parties afterwards bargained for the property independently of the loan; or if it shall appear that the chief inducement of the grantor in making the deed, was to procure the loan; or that the grantee, after the execution of the conveyance, treated the money which he had advanced as a substantial part of the consideration, and not as a loan. There is no proof in this case that the parties bargained without a reference to an advance by Nixon of $5000, and it does appear that Morris was only induced to make the deed from the offer of Nixon to make the advance of that sum, and that Nixon treated it substantially as a part of the consideration to be given for the property, as he took a bond from Morris for the amount, and says it was only to be contingently enforced, for the benefit of Morris or his family, in the event of Morris falling into misfortune.

Courts of equity will not permit so uncertain a benefit as is

here expressed, to weigh at all in their consideration of cases like this; for, if they did, it might become a contrivance to give plausible colouring to an originally meditated fraud, or to one induced by the temptation of subsequent gain.

But besides the transaction itself, as it appears in the pleadings, there were relations of interest and of agency, between Thomas Morris and Henry Nixon, in respect to the property; and such as grew out of the embarrassments of the former, and also out of his particular condition to the recitals of consideration in the deed, which combine to raise a violent presumption, of a secret trust, and that the deed was meant to secure Nixon's advances, loans, and endorsements for Morris.

Nixon claimed an interest in the property, besides the one-fourth of the moiety which Morris had agreed to convey to Walker and Henry Morris, in trust for Mrs. Nixon. For the former, Nixon had not such satisfactory evidence as he could rely upon. This appears from his correspondence. Morris was much embarrassed; no one knew his pecuniary difficulties better than Nixon did. He remembered, too, that Morris, without consulting him, had offered to mortgage the property to the United States. He feared, from the disclosures made by Henry Morris of the pressing necessity of his brother, that he might mortgage the property to raise the sum he then stood in need of, to some other person if Nixon did not advance it; so that, at some other time, urged by want of money or the demands of creditors, he might be induced to convey to others an interest in the concern. That new parties might interfere with the management of it, to the injury of all who were originally interested; that the bank, by any change in the ownership, and the course which might be pursued in respect to the property, might not continue to be so indulgent as it had been, in postponing the payment of the purchase-money still due. Besides, sales of this property to individuals and purchases from the city were then anticipated! the latter a slow, but sure speculation; almost at the price of the owners, from the contiguity of public works, which could not be abandoned; nor could they be carried on without more of the property than the city had already bought. Add, the embarrassed condition of Morris; the connexion and close intimacy between the parties; their excited expectations, extended by exaggerated

Morris v. Exec. of Nixon et al.

representations to the females of the family, that all concerned would realize great pecuniary advantages from the property; the certain interest, also, of Mrs. Nixon in it, and the certainty, that, by keeping it under their own control, it would be managed in their own way; all these considerations were cogent inducements with Nixon to get a legal title from Morris, and the moment when Henry Morris presented himself to solicit a loan for his brother was the occasion upon which it could certainly be obtained.

But further, Morris's condition, in respect to the consideration recited in the deed, was not such as to induce him to wish to part with the property. Nor does Nixon's assumption of the particular debts of Morris, recited in it, bear the aspect of a genuine purchase. It was not a present payment of any thing; and, if genuine, was the purchase of Morris's speculation, by an advance of $5000, which, according to the face of the transaction, was to be repaid. And may we not say, when in the same transaction we have it admitted that one of the documents was not meant by the parties to be what it purports, that another of them by this fact is subjected to suspicion?

But we have said, though Morris was embarrassed, that he was not pressed by any of the particulars recited in the deed as a consideration.

The purchase-money remaining due to the bank on the property, the bank had permitted to remain unpaid, finding no doubt its advantage in the interest. Both principal and interest were ultimately paid, not by Nixon, but by sales of the property.

The debt due to Biddle and Wharton was secured by a mortgage upon a part of the property, given by Morris with Nixon's consent. The notes discounted at the bank for the accommodation of Morris with Nixon's endorsement, had been renewed, and were running as an accommodation, to be renewed again and again, as they were in fact, without any change of names to the paper, after the deed was executed. Nixon could not press for the commissions claimed as agent of the property, or did not intend to do so; for we find him writing to Morris on the 21st May, two days before Henry Morris arrived in Philadelphia on his errand for the loan, and seven before the deed was executed, to make himself easy as to commissions, as it had not been his intention to ask for them; or acknowledging he had no right to

Vol. I.—17

do so, until "the final closing of the accounts, agreeably to the first agreement when the Hills were bought."

Such was the situation of Morris, in respect to the debts named in the deed as the consideration for which an absolute title was to pass. He was an embarrassed man, and hard pressed at that moment for $5000, and though destructive consequences were to assail him if he could not get it, is it likely that Nixon then could have been insensible to the ties which had united them, and could have made his distress the means of coercing from him an absolute conveyance, without a secret trust of all that he had left, upon which he could rest a hope to raise himself a little above his ruined fortune? We cannot think so. If we did, it would be our duty to give another aspect to this transaction, from which the defendants would derive no benefit.

If a doubt remained upon our minds in respect to the character which should be given to the deed, the letter from Nixon to Morris, of the 24th May, would remove it.

It may be considered; either as having been intended by the writer to put Morris at ease in respect to the conveyance and bond which were required, or as a letter calculated to mislead Morris in respect to the use which Nixon would make of the conveyance. The letter might be, either the artifice of the writer to accomplish an unjust intent, or the language of the letter and manner of using it might innocently mislead. In either event, if the letter is such as is likely to mislead, and from which it can be fairly implied, that it induced a confidence that the receiver of it would have any benefit from or interest in the property, he was required to convey contrary to the terms of the deed, it would be fatal to it as an absolute deed.

Nixon and Morris were brothers-in-law. There seems to have been between them fraternal intimacy and confidence. It appears to have been unlimited in all the relations of social life and of business. The confidence of Morris was unwavering, and dependent, from the superior business ability of Nixon. Nor can it be denied that it was met by him in Morris's difficulties by acts of timely assistance and kindness. Nixon had been his agent in the management of the property from 1812. He claimed an equitable interest in it, besides the proportion of Mrs. Nixon. There were unascertained accounts of Nixon's agency when the

deed was made. Morris had received no account since 1816, except an abstract of sales of some stone and gravel, furnished to him by one of the defendants in 1819. He did not know particularly what had been the proceeds of the sales and income of the property, or how they had been applied. No examination or estimate of the value of the residue of the property, as it then stood, was made. No communication had been given by the agent of the effect of public and private improvements upon it, in respect to its then, or prospective value. Nothing was said between Morris and Nixon as to the price that the taker was to give. In this situation, being greatly embarrassed, Morris asked a loan from his agent. The agent says, 'I am aware of your embarrassment. There are certain claims upon this property which you will have to pay, and other responsibilities of yours for which I am also answerable. I will provide the money of which you stand in need, will take a bond from you for it, which I am not to enforce against you, unless you should fall into misfortune, and then only, should I see fit to do so, for the benefit of yourself or your family, if you will give me an absolute conveyance of the property.' The conveyance is given, the bond is taken, and now it is said the transaction was intended to be an absolute sale, and not a security for a loan. We do not think that the connexion between the bond and the deed can be dismembered. Nor can we reconcile it with what we believe would have been the ordinary conduct of men in like circumstances, to suppose, that an agent so situated to a principal and friend in distress, could have intended, by asking for an absolute conveyance, to use it for any other purpose than to secure himself in the sum he was about to advance and his other responsibilities for his principal. Morris was a ruined man. Nixon knew it, and treated with him in this instance as if the crisis had come when creditors would no longer be satisfied with postponed promises. It was natural for Nixon, nor was it wrong in the then state of real property, and as he was about to advance to his brother-in-law $5000, to take the most efficient way to secure himself from loss, and to put it out of the power of Morris to interfere with his security, by subsequently giving to others an interest in the property. We find upon a preceding occasion when Morris was pressed, and had offered to mortgage this pro-

perty, that Nixon suggested that it should be put into his hands, with the trust expressed of what was intended. His object then was, that the original intention of the purchase might be carried out for the benefit of all concerned. Nixon's inducement to do so was greater than it had been at that time. Mrs. Nixon's interest of one-fourth in the moiety of the property had been in in the mean time secured to her by her brother.

We will now turn to the letter of the 24th May from Nixon to Morris, to confirm the view we have of this transaction. It begins,

"DEAR MORRIS,—Henry arrived here early yesterday morning. Having had a conversation with him on the subject of a loan, I have only to say, my best exertions will be to obtain this object, and to enable me to do which, Henry will immediately call upon you to advise you of the only mode that he or I can suggest to achieve it."

It must be remembered that the letter was written on the day that Nixon consulted his counsel, after the consultation had been had. The answer of Nixon shows this. He says, that he had concluded to provide the money, but that he must consult counsel before he finally agreed. And then that he thereupon returned to Henry Morris, and informed him of the determination he had come to of dealing upon no other terms than an absolute sale and conveyance, and taking a bond for the loan. When, then, Nixon says in the letter, "Henry will immediately call upon you to advise you of the only mode that he or I can suggest to achieve it," it is manifest that the mode had been a subject of conversation between them; and as he mentions in the letter, the loan in connexion with the mode, which Henry was to communicate to his brother, this contemporary letter must be called on to ascertain what Nixon intended by the mode; and more especially so, as it seems the contents of the letter had not been told to Henry Morris.

The mode was an absolute conveyance of the property and a bond. But there is, in connection with the mode, the declaration of an intention, coupled with an ability, in consequence of the mode, to achieve a loan. It would then be a very strained inference, from the words of the letter, to say, that Nixon did not mean that Morris, to whom he was writing, should understand

that he meant a loan, to be secured by a conveyance of the property, as well as by a bond; or that he meant, that the loan which he could achieve by the mode was to depend upon Morris making to him an absolute sale of the property for the considerations expressed in the deed. If such had been his meaning, it could have been plainly said. But we think there can be no doubt concerning what the writer of this letter meant, or the construction which, in a court of equity, should be put upon it, when we find him saying: " You, I am sure, will have confidence in me as to the mode proposed, which Henry will communicate; and be assured my sincere prayers will be and best exertions to promote this all-important point." This language indicates a sincere desire in Nixon at that time to relieve the distress of his brother-in-law. That he intended to solicit his confidence as to the mode proposed, to secure himself from loss, without depriving Morris of a participation in the prospective advantages which they had mutually indulged for ten years in respect to the property, and which, it cannot be denied, had in a great degree been excited by the representations of Nixon. In Morris's situation it was a great point gained for the benefit of all concerned in the property, that the legal control of it should be taken from him and vested in Nixon.

This letter we think a part of the entire transaction, and stamps its character in a court of equity. It could only have been intended to put Morris at ease in respect to the absolute conveyance which Nixon required; or it was designed mislead and deceive Morris, by expressions of sympathy which were not felt, and a solicitation of confidence not deserved. If the latter, we should feel bound to pronounce the transaction a meditated fraud, successfully accomplished. We adopt the first as most probable, and in that view of the case decree the conveyance of the 24th May, 1822, to be a deed, with a secret trust, for the security of moneys loaned and advanced by Nixon to the grantor. This conclusion makes it unnecessary for us to consider the effect of time upon the rights in controversy.

We order the decree of the Circuit Court to be reversed, and that the cause be remanded, with instructions to the court to have an account taken, and that the complainant be allowed his

M

proportion at the rate of an interest of five-eighths in a moiety of the original purchase of Morris and Williams, and that the court shall take such other proceedings in the cause as equity may require.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here considered, ordered, and decreed by this court, that the decree of the said Circuit Court in this cause be and the same is hereby reversed, with costs, and that this cause be and the same is hereby remanded to the said Circuit Court, with instructions to that court to have an account taken; and that the complainant be allowed his proportion at the rate of an interest of five-eighths in a moiety of the original purchase of Morris and Williams, and that the said court shall take such other proceedings in the cause as equity may require.