(No. 25765.—

THE CARTER OIL COMPANY *et al.* Appellees, *vs.* MABEL DURBIN *et al.*—(CHARLES M. KOEBERLEIN, Appellant.)

*Opinion filed Feb. 14, 1941—Rehearing denied April 8, 1941.*

SMITH & MURRAY, and WILLIAM C. STEPHENS, for appellant.

WALTER DAVISON, and CRAIG & CRAIG, (L. G. OWEN, of counsel,) for appellee the Carter Oil Company.

WILL P. WELKER, for cross-appellants, George W. Durbin *et al.*

Mr. JUSTICE SHAW delivered the opinion of the court:

This litigation originated as a suit in chancery commenced by the Carter Oil Company against Mabel Durbin, Harvey H. Durbin, George W. Durbin, Minnie L. Durbin, and Charles M. Koeberlein seeking to redeem from a decree of strict foreclosure which had theretofore been entered in the circuit court of Fayette county, and also seeking to validate an existing oil and gas lease. The cause was heard in the circuit court on the amended complaint and answers and a counter-claim of George W. Durbin and Minnie L. Durbin which will be noticed later in this opinion. The cause was heard in open court and resulted in a finding that the equities were with the Carter Oil Company on its amended complaint, and that as to the counter-claim of George W. Durbin and Minnie L. Durbin the equities were with the defendant Charles M. Koeberlein, and that the counter-claim should be dismissed for want of equity.

The facts found by the trial court are as follows: On August 25, 1936, George W. Durbin and Minnie L. Durbin, his wife, who were then the owners of the premises in question entered into an oil and gas lease thereon with M. R. Von Almen, which lease was duly recorded November 6, 1936; that Von Almen was, at that time, acting as an employee and agent of the Carter Oil Company, and that the company became the owner of the lease immediately upon its execution, although it was not assigned until October 20, 1937. On June 23, 1937, the Durbins executed a correction of the description in the lease to make it more definite and certain. The oil company complied with all of the terms of the lease including payment of delay rentals, and was not in default notwithstanding that Charles M. Koeberlein had, prior to the due date of each of said rentals in the years 1937 and 1938, notified the company and the depository bank that he would refuse to accept them.

The court further found that in March, 1937, Mabel Durbin had been the holder of certain mortgage indebtedness which had been given by the then owners of the real estate in question, George W. Durbin and Minnie L. Durbin, and a bill was filed to foreclose that mortgage. The mortgage was dated January 15, 1930, approximately six and a half years prior to the date of the oil and gas lease. The only parties defendant to that foreclosure suit were George W. Durbin and Minnie L. Durbin. Neither Von Almen nor the Carter Oil Company was brought in, although the oil and gas lease was at that time of record. On May 15, 1937, in this foreclosure suit, a decree of strict foreclosure was entered requiring George W. Durbin and Minnie L. Durbin to pay $2150.84 to the complainant within three months, with interest, or that their rights in the premises should be barred and the title vested in Mabel Durbin. Within this three-months' period, on July 26, 1937, Mabel Durbin and her husband conveyed the premises by quit-

claim deed to Charles Koeberlein, and on the same date but under a deed bearing date two days later the defendants George W. Durbin and Minnie L. Durbin did likewise. In the meantime,—that is, between the date of the decree and the execution of the two quitclaim deeds, the correction to the oil and gas lease above mentioned, for the purpose of clarifying the description of the land leased, had been executed and delivered.

At this point it should be noted that the oil and gas lease which the Durbins gave to Von Almen and which Von Almen assigned to the Carter Oil Company, contained the following provision. "Lessor hereby warrants and agrees to defend the title to the said lands herein described, and agrees that the lessee shall have the right at any time to redeem for lessor, by payment, any mortgages, taxes, or other liens on the above described lands, in the event of default of payment by lessor, and be subrogated to the rights of the holder hereof," etc.

The court further found that on September 27, 1938, the Carter Oil Company tendered to Koeberlein the sum of $2535.08, which was the total amount necessary to redeem; that the Carter Oil Company had a right to redeem and that it held a good, valid and subsisting oil lease on the premises. Koeberlein refused the tender. The court found that the Durbins had abandoned any homestead interest in the premises, which they had prayed for by their answer above mentioned, and that they were not entitled to any relief under their counter-claim.

The court found the equities to be with the plaintiff on its amended complaint and that it was entitled to redeem. It was ordered that within sixty days from the date of the decree the Carter Oil Company should deposit the sum of $2535.08 with the clerk of the court and, upon making such deposit, it should be deemed and decreed to have redeemed from said foreclosure sale so far as the oil and gas lease

was concerned, and provided that the money should be paid by the clerk to Koeberlein on his demand therefor and that the land, on said payment being made, should be subjected to the oil and gas lease of the Carter Oil Company.

It was further ordered (pursuant to the subrogation clause above quoted) that the Carter Oil Company should have a lien upon the land covered by the lease; that Koeberlein should have the right to redeem from said lien and that if he failed to do so within ninety days the Carter Oil Company should have a right to foreclose that lien, and decreed that the court should retain jurisdiction for that purpose. The counter-claim of the Durbins was also dismissed for want of equity.

The counter-claim of the Durbins' requires our first consideration, because if it is sustainable there is no occasion to consider any of the other arguments or points presented. It was, in substance, alleged by them that the deed which they gave to Koeberlein was, in fact, intended as security only for money to be paid by Koeberlein to Mabel Durbin to prevent the decree of strict foreclosure from becoming final and to allow them a period of redemption; that the deed from Mabel to Koeberlein and the deed from George W. and Minnie L. Durbin to Koeberlein were, in fact, made on the same date as a part of the same transaction, within the period of ninety days limited in the decree of strict foreclosure and in settlement and compromise of the mortgage indebtedness. It was also claimed by George W. and Minnie L. Durbin that the premises were their homestead, that their deed was never acknowledged and was, therefore, void. It was their prayer for relief that they be permitted to repay to Koeberlein the sums of money which he had advanced for them and that he be required to convey the premises to them; that it might be found that the premises had a value not exceeding $1000 and was the homestead of the counterclaimants, and that, therefore, Koeberlein took nothing by the deed.

There was also a prayer for general relief and an attached copy of a tender from them to Koeberlein of all redemption money, dated March 30, 1939.

To this counter-claim Koeberlein answered, in substance admitting that the deed from George W. and Minnie L. Durbin was signed and delivered on the same date as the deed from Mabel Durbin. It is to be noted, in this connection, that on trial of the case he strenuously contested this date. The answer denied any promise of a right to redeem and averred that Koeberlein acquired title to the premises under a deed from Mabel Durbin and her husband dated July 26, 1937, and that "said deed made by said George W. Durbin and Minnie L. Durbin to this defendant was made only for the purpose of waiving the right to redeem from said foreclosure decree; * * * that by said deed said George W. Durbin and Minnie L. Durbin did waive the right to redeem from said foreclosure decree." His answer further avers, "that said deed was made solely for the purpose of waiving the right of the said George W. Durbin and Minnie L. Durbin and of the plaintiff herein to redeem said premises from said foreclosure decree, the title to which is already vested in this defendant by said foreclosure decree and by said deed from Mabel Durbin and Harvey H. Durbin, her husband, to this defendant." It will be noted from the foregoing pleadings that Koeberlein squarely placed his case and the theory of the title by which he claims on (1) the quitclaim deed from Mabel and Harvey Durbin of July 26, 1937, and (2) a release by George W. and Minnie L. Durbin of their right of redemption, said to have been accomplished by their quitclaim deed of the same date and another document called "Waiver of right of redemption," executed at the same time, and which will be referred to later. It is, therefore, necessary first to inquire as to the nature, character, and extent of the title conveyed by the quitclaim deed from Mabel Durbin, and, second, as to the

legal effect of the quitclaim deed and waiver of redemption executed on the evening of the same day by George W. and Minnie L. Durbin at their home, and not notarized.

The answer of Koeberlein indicates a definite misconception of the legal effect of the quitclaim deed which he obtained from Mabel. At the time this deed was executed, Mabel's mortgage and mortgage indebtedness had been merged in the decree of strict foreclosure which she had obtained and that decree represented the extent of her rights against George W. Durbin and Minnie L. Durbin and her interest in the real estate in question. Under the strict terms of that decree she would have become entitled to an indefeasible estate in the land eventually,—*i.e.*, ninety days after the decree, but no sooner,—and not at all if the money due her was paid. Prior to the decree she was the owner of the legal title to the land, but it was an anomalous title, existing only as between her and George W. Durbin and only for the limited purpose of securing her indebtedness. As against every other person and for every other purpose George W. Durbin was the owner. (*Lightcap* v. *Bradley,* 186 Ill. 510, and cases there cited.) It necessarily follows that when Koeberlein took his quitclaim deed from Mabel Durbin he obtained nothing more than an equitable assignment of her rights in the decree of foreclosure and placed himself in her shoes,—*i.e.*, he became the mortgagee and judgment creditor subject to redemption, and his relationship to George W. and Minnie L. Durbin was identical with the relationship which had theretofore existed between Mabel and George as mortgagee and mortgagor. It is, therefore, necessary to consider the nature of this relationship, the relationship of the parties to each other, the surrounding circumstances, and the things that happened in connection with and immediately following the execution of the deed from Mabel.

At the time of the transactions in question the Durbins were insolvent farmers and indebted to George's sister-in-law for somewhere near the entire value of their farm.

They were also indebted to Koeberlein in various sums not definitely fixed by the record. It was claimed by him in his testimony that he had some of their chattel mortgages, one of them being a lien against their grain binder, and that he was also surety for them on some notes which he had signed for them at the Fayette County Bank. The Durbins had, for three or four years, rented the house on their homestead to various tenants and had rented the land to Koeberlein, while they, in turn, had rented a farm from Koeberlein on which they were living. The parties thus stood in the relation of landlord and tenant each to the other. At the precise time of the transaction the harvest was on and there was some hay on the George Durbin farm, which is here in suit, which was ready to cut and in which George W. Durbin had a half-interest under the terms of his lease with Koeberlein, the other half being owned by Koeberlein. The place was also used to pasture a number of Koeberlein's cattle.

Koeberlein himself was a merchant and banker and large land owner, much of it apparently under lease to various oil companies. He ran a general store in St. Elmo where he was stockholder, director and president of the First National Bank of St. Elmo. He testified that he had known George W. Durbin since he was a boy and that they had grown up together; that he had known Minnie Durbin since 1911. It also appears that he had two sons helping him at his store and bank, one of whom could do typing, had studied some commercial law and possessed a form-book. Some of the instruments in question appeared to have been prepared from that book and typed by this son. George W. and Minnie L. Durbin were at no time represented by counsel, either in the proceedings resulting in the strict foreclosure decree, or in the transaction concerning their supposed waiver of the right of redemption.

Shortly after the entry of that decree of strict foreclosure Mabel's attorney wrote a letter to Koeberlein advising him of the decree, telling him that Mabel intended

to take immediate possession of the land with its crops and that he, Koeberlein, would have to get his cattle out of there. In reply to that, Koeberlein wrote a letter to the attorney stating that he had talked to Mabel about the matter; that George Durbin was owing him on a judgment note, open accounts, and notes upon which he was surety. He said in that letter that he would like to take the farm over from Mabel, "thereby securing my credit somewhat"; he further said "George still thinks he will be able to redeem the place. Therefore I would like very much to hear from you with regard to this matter. If I cannot buy Mabel out or the amount be too large I have in mind to take some more personal property or securities." It is convenient to note in connection with this letter, at this point, that when Koeberlein was cross-examined he refused to admit or deny his handwriting or his signature, saying merely that he did not know, although another member of his family had no difficulty in recognizing the writing. Thereafter, and on July 26, 1937, Koeberlein went to the office of Mabel's attorney, paid to him the entire amount due on the mortgage judgment, including principal, interest, attorney's fees, and costs, and received a quitclaim deed from Mabel and her husband, which is mentioned above, and which was recorded two days later. It does not appear from the record in this case that the judgment was ever satisfied.

Concerning this transaction Koeberlein alone testified, Mabel's attorney not being called because, at the time of the trial of this case, he was representing George W. and Minnie L. Durbin. Koeberlein said he could not get delivery of the deed until he procured a waiver of the right of redemption, but on the trial of the case, when Mabel's attorney was asked to produce such a document, he disclaimed any knowledge of the existence of any such waiver. In view of the very faint probative value of Koeberlein's testimony, and the fact that such a document was entirely immaterial to Mabel or her attorney, we are inclined to

doubt this statement. However that may be, it is entirely clear and proved to our satisfaction, that on the evening of the same day that Mabel's deed was signed and acknowledged Koeberlein went back to St. Elmo and, with the aid of one or both of his sons, prepared three documents to be signed by George W. and Minnie L. Durbin. These instruments were: (1) A power of attorney from George W. Durbin and Minnie L. Durbin wherein they made, constituted, and appointed Charles M. Koeberlein their true and lawful attorney "to sign any legal documents necessary in the settlement of the case of Mabel Durbin against George W. Durbin and Minnie L. Durbin." This instrument contained the usual formal language of a general power of attorney. (2) An instrument whereby George W. Durbin and Minnie L. Durbin "do waive all rights of redemption from a mortgage foreclosure and all lands described hereafter on which Mabel Durbin did file a foreclosure and the court did render her a decree. We further waive all rights to redeem the lands described hereafter by a quitclaim deed for a consideration of $50 and request that Mabel Durbin and Harvey Durbin quitclaim unto Charles M. Koeberlein upon payment of the sum of $2285.61." This is followed by the legal description of the property in question and, like the power of attorney, is dated July 28, 1937, although it is clear from the evidence that both were executed on July 26. Each of these instruments purports to have been signed and sealed in the presence of H. R. Fogler, a notary public, and carry his signature and seal, although it is definitely proved that he was not present. (3) The third instrument was the quitclaim deed from George W. Durbin and Minnie L. Durbin to Charles M. Koeberlein which is above mentioned. This carries the full notarial acknowledgment of H. R. Fogler, who was not present.

It is Koeberlein's testimony that he did not go to the home of the Durbins that night, but went on the night following and that he took with him his two sons and two

other boys. His answer admitted that he had gone on the same day he had been to Vandalia and it happened that there was a small social gathering at Durbin's home the night Koeberlein went there. His testimony as to the circumstances and date was clearly impeached by many disinterested witnesses who attended the social gathering, who were certain of the date by reason of a funeral the day before which many of them had attended, and there is little room to doubt the accuracy of their testimony. These witnesses not only testified that he came on July 26, but that he came alone. It was Koeberlein's testimony that he had dickered with George Durbin for several weeks about buying his farm; that George wanted $100 for his equity but that Koeberlein was adamant in refusing to pay more than $50. He said that George offered to take $60 but that he still refused to pay more than $50, and that George finally consented to accept that sum. He testified that he read the papers very carefully to both of the Durbins and that they signed them in consideration of his promise that he would pay $50 on two notes at the Fayette County Bank which he had signed as surety with George Durbin; that Minnie Durbin was crying and reluctant to sign the papers and that she was slow about finding any abstract and he told her to let it go until some other time. He did not even claim any notary was present, nor that he paid any money at all. He did claim that several months afterwards he paid $15 on one note which he had signed as surety with George Durbin, and that two or three months later he paid $35 on another similar note. H. R. Fogler, whose name as notary public and notarial seal are attached to the three documents above mentioned was not called as a witness and we have no way of knowing whether his signature and seal are genuine. It is undisputed, however, that he was not present, did not witness and did not take the acknowledgment of the Durbin's to any of said instruments. The quitclaim deed which Koeberlein took that night from

George W. and Minnie L. Durbin was kept privately by Koeberlein for about a year without being recorded and was not recorded by him then until a demand had been made for redemption of the premises.

It further appears from the testimony of Koeberlein that at the time of this transaction the 107½ acres of land was not worth more than $2400, and that at the time of the trial it was worth a quarter of a million dollars.

George W. Durbin and Minnie L. Durbin each testified that Koeberlein offered to settle with Mabel, take over the indebtedness and give them two years at seven per cent interest within which to redeem and that they quitclaimed to him for the purpose of carrying out that arrangement. They were corroborated by one of their children, who claims to have been home at the time and to have heard part of the conversation. In the view which we take of the case and the evaluation which we place on Koeberlein's testimony their testimony requires no great amount of corroboration.

We have pointed out above that by his deed from Mabel Durbin, Koeberlein took no legal title but merely an equitable assignment of her rights as mortgagee and foreclosure creditor. We also noticed that Koeberlein's theory of the case is disclosed by his answer that he had taken the quitclaim deed from the Durbins merely for the purpose of extinguishing their right of redemption. This answer clearly places him, on his own theory of the case, in the position of a mortgagee dealing with his mortgagor for a conveyance of the mortgagor's equity. This relationship is one about which the law is very strict, not only in Illinois, but everywhere. While it is not legally impossible for a mortgagee to acquire the mortgagor's equity of redemption, yet such a transfer or agreement to transfer is one that is jealously regarded by a court of equity and which will be strictly scrutinized for evidence of oppression, fraud or unfairness. It is the spirit and intent of

our law and it is our public policy, as declared by the statutes of this State, that mortgagors shall have a reasonable time within which to redeem, and such laws have always been liberally construed. Reflection makes it apparent that our public policy as to redemption could not be maintained under any other rule.

All of the text books and cases agree on this subject and numerous citations are unnecessary. The rule has been succinctly stated by the Supreme Court of the United States as long ago as 1870 in the case of *Alexander* v. *Rodriguez,* 12 Wall. 323, where the court said: "The law upon the subject of the right to redeem where the mortgagor has conveyed to the mortgagee the equity of redemption, is well settled. It is characterized by a jealous and salutary policy. Principles almost as stern are applied as those which govern where a sale by a *cestui que trust* to his trustee is drawn in question. To give validity to such a sale by a mortgagor it must be shown that the conduct of the mortgagee, was, in all things, fair and frank and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. Where confidential relations and the means of oppression exist, the scrutiny is severer than in cases of a different character. The form of the instruments employed is immaterial. That the mortgagor knowingly surrendered and never intended to reclaim is of no consequence. If there is vice in the transaction, the law, while it will secure to the mortgagee his debt, with interest, will compel him to give back that which he has taken with unclean hands. Public policy, sound morals and the protection due to those whose property is thus involved, require that such should be the law. *Morris* v. *Nixon,* 1 How. 118; *Russell* v. *Southard,* 12 id. 139; *Wakeman* v. *Hazleton,*

3 Barb. Ch. 148; 4 Kent's Com. 143; *Holmes* v. *Grant,*
8 Paige, 245; 3 Lead Cas. Eq. 625."

When this rule of law is applied to the transaction we
are considering, only one result is possible. It is said that
the mortgagee must not take undue advantage of the fears
or poverty of a mortgagor and yet he did so in this case.
The mortgagors were subject to a decree of strict foreclos-
ure—the harshest remedy known to a court of equity; the
mortgagors were indebted to the mortgagee on other in-
debtedness, in part represented by a chattel mortgage on
the grain binder at harvest time with the crop ready to
harvest; the mortgagors were said to be insolvent and
were faced with the imminent loss of their homestead.
The rule requires that the mortgagee must show that he
has been fair and frank and that he has paid for the prop-
erty what it was worth. As to fairness and frankness
Koeberlein did not even testify that he told George and
Minnie Durbin he had been to Vandalia and settled with
Mabel's attorney. The evidence affirmatively discloses that
he paid absolutely nothing for the deed, merely promising
to pay that for which he was already bound—*i.e.,* some
notes on which he was surety and which, by the insolvency
of the makers, he would have had to make good. The
evidence also shows that no matter what the parties may
have thought about the value of the land it was proved
within less than the normal period of redemption to be
worth a quarter of a million dollars. The rule is that any
indirection or obliquity of conduct will be fatal to any
title which the mortgagee acquires thereby, and yet such
obliquities are numerous in this case. He falsely and fraud-
ulently procured from the Durbins a power of attorney to
sign their names to any papers necessary to settle with
Mabel Durbin when he had already settled and knew that
no such papers had to be signed on the deal he had made
and would not be required for signature, unless it might be
upon some agreement extending the period of redemption.

Under the most favorable interpretation to him he made himself their agent and liable to account. Under the only other possible interpretation he tricked and defrauded them. Other badges of fraud are apparent. Thus, we must notice the clandestine nature of the visit to the Durbin home without a notary public or disinterested witnesses, the procuring of ficticious acknowledgments and his failure to record the deed until demand for redemption. We must also note his obvious lack of frankness and honesty when he tried to deny his letter to Mabel's attorney, written by himself. A careful examination of his entire testimony which would unduly prolong this opinion would disclose other frailties. It is enough to say that he has not sustained the burden of showing that degree of fairness which the law requires of anyone who attempts to secure his mortgagor's equity of redemption for himself.

Our conclusions on this branch of the case dispose of all issues without considering the matters originally raised by the Carter Oil Company. We are satisfied with the correctness of the decree of the trial court on that issue, but will not consider it in this opinion. The trial court found that the lease of the Carter Oil Company was and is a valid and subsisting lease and that portion of its decree will be affirmed. George W. Durbin and Minnie L. Durbin admit and assert this lease to be valid and there is no dispute between them and the Carter Oil Company. That part of the decree which dismissed the counter-claim of George W. Durbin and Minnie L. Durbin for want of equity is reversed. The cause is remanded to the circuit court of Fayette county with directions to enter a decree in accordance with the views herein expressed.

*Affirmed in part, reversed in part,*
*and remanded, with directions.*