WALTER W. SMITH *et al.,* Appellants, *vs.* THE FARMERS AND MERCHANTS BANK OF CARLYLE, ILLINOIS *et al.,* Appellees.

*Opinion filed Sept. 18, 1947—Rehearing denied November 17, 1947.*

HILL & DOLAN, of Mt. Vernon, and WHAM & WHAM, of Centralia, for appellants.

JOSEPH B. SCHLARMAN, and MAURICE B. JOHNSTON, both of Carlyle, for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

Plaintiffs appealed to the Appellate Court from a decree of the circuit court of Clinton County dismissing, for want of equity, their amended complaint. The Appellate Court, Fourth District, affirmed the decree, and upon petition we granted leave to appeal to this court.

Walter W. Smith, his divorced wife, Minnie Smith, also known as Mrs. R. V. Ramsey, and his present wife, Nellie Smith, brought this action against The Farmers and Merchants Bank of Carlyle, Illinois, Joseph H. Schaefer and H. P. Lampen, trustees, seeking to have a warranty deed made and executed by Smith and Mrs. Ramsey de-

clared to have been given as security for the payment of a promissory note for $700 owed by Smith and Mrs. Ramsey to the bank. The plaintiffs also pray for an accounting and pray that Nellie Smith, the present wife of Walter Smith, be decreed to possess an inchoate right of dower in the real estate. The answer avers that plaintiffs had recognized the ownership of the land in the defendants, that plaintiffs were guilty of *laches* and denies that plaintiffs are entitled to any relief whatsoever. Upon a full hearing by the court, the complaint was dismissed for want of equity.

The evidence discloses that Smith and Mrs. Ramsey were husband and wife from 1903 until May 15, 1933, when they were divorced. The decree of divorce settled no property rights between these two persons. On February 5, 1934, Smith and his first wife, being indebted to the bank on their unsecured note, executed their promissory note in the amount of $700 due one year after date, secured by their trust deed to Joseph H. Schaefer as trustee, covering an undivided three-eights interest in 520 acres of land known as "White Oak Island." Joseph H. Schaefer, the grantee in the trust deed, was president of the defendant bank.

The White Oak Island land had been previously acquired by Smith and Paul V. Schaefer, a brother of Joseph Schaefer. They sold an interest therein to one Gordon Houck and these men operated this land as the Kaskaskia River Hunting and Fishing Club. An account was opened in this name in the defendant bank, which account contained monies received from the land for hunting and fishing permits, farming and from timber operations on the property. The money from this account was used to pay taxes and expenses in connection with the property. The account was handled by Paul Schaefer, who at that time was also an officer of the defendant bank.

There is great conflict in the evidence. Smith stated at the trial of the cause that subsequent to the execution of the note and trust deed he was asked to call at the bank and pay the interest on the note. He testified that after several talks with Joseph Schaefer he was asked what he could give as further collateral and replied that he had the three-eights interest in the White Oak Island property. According to Smith, Schaefer said he would take it up with the directors and that the next day Schaefer told him that the bank would take this property as additional security for this note of $700, whereupon, on June 19, 1935, Schaefer drew the warranty deed to the bank and Smith signed it. Smith further states that, after signing the deed, he left it with Joseph Schaefer, who was to procure the signature of his former wife, Minnie Smith (Mrs. R. V. Ramsey). Minnie Smith states that she received the deed with a letter from the bank which stated that the deed was to be signed and returned and was only to be used as security for the $700 debt. Her testimony in this regard is supported by that of an attorney in Yakima, Washington, Don Tunstall, who testified by deposition that he remembered seeing the letter, that it was on the stationery of the bank and that it referred to the deed as being security only. The deed was signed and returned by Minnie Smith on June 25, 1935, and it was filed for record on July 16, 1935. On August 12, 1935, Joseph Schaefer, as trustee in the trust deed, released the trust deed of record. Smith testified that the note and trust deed were never returned to him.

Joseph Schaefer testified that the proposal was made by Smith that he deed the interest in the land in full settlement and liquidation of the note. He further testified that Smith secured the divorced wife's signature on the deed. Schaefer states that he thought that the note and trust deed had been returned in the ordinary course of

business and that, in any case, they were not in the files of the bank.

Subsequent to 1935, there was a period of quiescence insofar as the property in question was concerned. Smith, however, continued to cut timber on the land as he had done previously and he also arranged for a conference between the two Schaefers and one Conrey, an oil driller, for the purpose of negotiating oil and gas leases for the land. In addition he forced a settlement with one Edward Buchele who had trespassed upon the premises and cut timber therefrom.

In 1939 the bank, Paul Schaefer and Gordon Houck gave an oil and gas lease to an agent for the Magnolia Petroleum Company covering 120 acres of the White Oak Island land for a cash consideration of $1080 for the years 1940 to 1944, inclusive. Certain rentals were paid under this lease. Sometime between this date and August, 1940, the Texas Company entered into negotiations for oil and gas leases covering 320 acres of this land and offered $40 per acre for such a lease. On August 1, 1940, the bank conveyed the property to J. B. Lampen, a brother of the defendant, H. P. Lampen, for $668, the total amount due and owing on the original debt of Smith and his first wife. J. B. Lampen and wife, in turn, reconveyed the property to Joseph Schaefer and H. P. Lampen, as trustees, for the benefit of a group comprised of stockholders of the bank. Oil and gas leases were then entered into with the Texas Company. About this time Schaefer called on Smith for the purpose, he says, of securing an affidavit of nonownership in the land from Smith. Smith claims that Schaefer said the document he wished him to sign was an oil and gas lease on the property.

The minutes of the bank meeting held on May 2, 1935, purporting to authorize the acceptance of the land in full settlement of the note were put into evidence. These minutes were questioned by the plaintiffs at the hearing, and

it was pointed out that such minutes could not have been written at the time that the defendants testified that they were placed on paper. A copy of a letter written by the bank to the Auditor of Public Accounts, dated March 20, 1935, was also introduced. This letter refers to the past due account of Walter W. Smith and Minnie Smith, sets forth the payment of $32 on the principal, and states that security for the note is ample. In addition to all the deeds comprising this transaction, the bank's discount records, purporting to show payment in August, 1935, of the note in question, were also introduced.

It is admitted by the defendants that at the time the deed in question in this cause was given to the bank, a debt of $700 was owing to said bank secured by a trust deed. The relationship of mortgagee and mortgagor was already in existence and had been for some time. The defendants contend, however, that the effect of the deed was to extinguish the right of redemption of the debtors and to permit the bank to obtain the property without the necessity of foreclosure. Whatever view be taken of this transaction, the situation existing at the time the deed was given to the bank places this case squarely within the principles of *Carter Oil Co.* v. *Durbin,* 376 Ill. 398, and *Burton* v. *Perry,* 146 Ill. 71.

In *Burton* v. *Perry,* 146 Ill. 71, on page 114, we said: "In order to determine whether a conveyance made by the mortgagor to the mortgagee operates as an extinguishment of the right of redemption, it must be made to appear that the parties intended such conveyance to be a payment of the debt." It is to be noted that in this cause the deed was a joint deed whereby both Smith and his first wife deeded the land to the bank. It is obvious from a reading of the record herein that there was no intendment on the part of Mrs. Ramsey that the deed should have the effect for which the defendants contend. The release of the trust deed on August 12, 1935, standing alone, does not

support a contrary conclusion. The release of the trust deed, upon the receipt of additional security, could properly be expected in such circumstances. By the release of the trust deed, if we consider the deed signed by Smith and his first wife to be security for the debt, the bank merely substituted one form of security for another. Nor is the testimony of Schaefer in this regard borne out by the minutes of the bank meeting of May 2, 1935. The minutes of that meeting are interspersed in chronological order with records of the bank meetings from January 3, 1935, up to the year 1939. The minutes from January 3, 1935, to May 6, 1937, are all written in longhand with one exception, which is the meeting on which defendants rely. It is to be noted that at the trial of this cause it was testified to by both Schaefer and the cashier of the bank that the minutes of this meeting were written up within two weeks of the meeting itself or not later than May 16. In said minutes of such meeting Minnie Smith is referred to as Mrs. R. V. Ramsey. It was testified to at the trial of this cause, and it is not contradicted in the record, that Minnie Smith was not married to Ramsey until May 29, 1935. It should be further pointed out that on June 19, 1935, when Schaefer testified he drew the deed for Smith to sign, he still did not know that Minnie Smith had married R. V. Ramsey in Yakima, Washington.

Joseph Schaefer testified for the defendants to the effect that the deed in question was given to the bank in full payment and liquidation of the indebtedness. Opposed to this testimony there was the evidence of Walter Smith and Mrs. R. V. Ramsey, his first wife, who in turn was supported by Don Tunstall, a disinterested witness and a practising attorney in Yakima, Washington. Whatever conflict there may be between Smith and Schaefer in this regard there is no evidence in the record whatsoever to contradict the statements in the record that both Mrs. Ramsey and her attorney, Tunstall, believed this deed to

be given as security for the indebtedness then owing the bank.

The whereabouts of the note and the trust deed are unexplained. Both Smith and Mrs. Ramsey state that they have never received the note and the trust deed from the bank. Schaefer testified that he thought the note and the trust deed had been mailed to Smith in the ordinary course of business affairs, but that in any case they were not in the files of the bank. Further, the deed signed by Smith on June 19, 1935, when recorded, did not bear revenue stamps. He still retained his interest in the Fishing and Hunting Club bank account. All of these items tend to support the plaintiffs' theory of the case, that the deed was given as additional security. This is further supported by the events subsequent to 1935. During the years prior to 1935, Walter Smith had been in the custom of entering upon the White Oak Island land and cutting timber to carry on his business. He followed the same procedure subsequent to the giving of the deed in question. In the years which followed the giving of this deed Smith continued to go on the land and cut timber as he had in the past. It came to his attention that one Buchele was trespassing on the land and cutting timber. Smith forced Buchele into a settlement for his trespass and for the timber he had cut, and, at the time he brought the man to the bank to effect such settlement, no words were stated to him which would indicate that he had any less interest than he had before giving the deed. Some three or four years after this deed had been accepted by the bank, Walter Smith arranged and attended a conference with Joseph Schaefer, Paul Schaefer and T. M. Conrey whose business was that of oil drilling. The conference was arranged for the purpose of negotiating an oil and gas lease of the lands in question. At that time, Smith made the statement that he would rather have a well drilled than to sell the lease. He further stated he felt that Mr. Houck would

feel the same way. At that meeting Smith was asked by Paul Schaefer as to whether or not he was getting anything out of the property or the negotiations that the rest of them were not. This meeting and these statements are admitted by both Paul Schaefer and Joseph Schaefer and, apparently, nothing was said at this time to correct Smith's obvious impression of ownership. Finally, at the time the negotiations were conducted between the Texas Company and Joseph Schaefer, Joseph Schaefer went to Smith's home. He states that he wished to obtain an affidavit from Smith for the clearing of the title to the land. Smith states that the document was an oil and gas lease. In either case, it indicates to this court that there was a doubt in Schaefer's mind as to the title to the land at that time.

This court considered a similar situation at length in *Carter Oil Co.* v. *Durbin,* 376 Ill. 398, wherein we stated: "This answer clearly places him, on his own theory of the case, in the position of a mortgagee dealing with his mortgagor for a conveyance of the mortgagor's equity. This relationship is one about which the law is very strict, not only in Illinois, but everywhere. While it is not legally impossible for a mortgagee to acquire the mortgagor's equity of redemption, yet such a transfer or agreement to transfer is one that is jealously regarded by a court of equity and which would be strictly scrutinized for evidence of oppression, fraud or unfairness. It is the spirit and intent of our law and it is our public policy, as declared by the statutes of this State, that mortgagors shall have a reasonable time within which to redeem, and such laws have always been liberally construed." This is the situation in the instant cause. The mortgagee, the bank, was dealing with the mortgagor for a conveyance of the mortgagor's equity. An attempt was made to extinguish the right of redemption in the plaintiffs. Under the factual situation here, the rule of *Carter Oil Co.* v. *Durbin,* 376

Ill. 398, applies. It should be noted in that case we stated: "Principles almost as stern are applied as those which govern where a sale by *cestui que trust* to his trustee is drawn in question."

Further, in the case of *Burton* v. *Perry*, 146 Ill. 71, on page 114, we stated: "The deed will not be regarded as a release of the equity of redemption, unless it is made for a consideration which is adequate, and which would be deemed reasonable if the transaction were between other parties. If the value of the mortgaged premises greatly exceeds the debt secured by the mortgage, the fact of such excess will tend to show that a release was not intended. [Citation.] A subsequent recognition by the mortgagee of the continued existence of the relation of debtor and creditor between the mortgagor and himself will be a circumstance tending to show the absence of such an intention." There was conflicting testimony as to the value of the White Oaks Island land. The general range of such estimates ran from $4 per acre to as high as $15 per acre, the witnesses for the defendants testifying that the land was worth approximately $4 per acre. Even accepting this value of the land in question, the three-eighths interest owned by Smith would be worth $780. The evidence, read as a whole, sustains a belief that the plaintiffs did not intend that this deed should be considered as a deed absolute on its face and that the plaintiffs were not treated by the defendants with all the fairness which equity requires in a case of this type.

The judgment of the Appellate Court and the decree of the circuit court of Clinton County, therefore, are reversed and the cause is remanded to the circuit court with directions to enter a decree for the plaintiffs in conformity with the views expressed in this opinion.

*Reversed and remanded, with directions.*